Filed 1/18/22  P. v. Simmons CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>PATRICK LEO SIMMONS,<br><br>        Defendant and Appellant. | H046379<br>(Santa Clara County<br>Super. Ct. No. B1577674) |

In 2015, defendant Patrick Leo Simmons befriended the then 15-year-old victim, had consensual and nonconsensual sex with her, assaulted her, and acted as her pimp while she worked as a prostitute.[1]  Simmons was convicted by a jury of multiple crimes, including human trafficking (Pen. Code, § 236.1, subd. (c)),[2] sexual offenses, and several offenses related to acts of domestic violence.  The trial court sentenced Simmons to a total term of 15 years to life consecutive to a determinate term of 28 years in prison.

On appeal, Simmons argues that his conviction for human trafficking under section 236.1, subdivision (c) must be reversed because the statute violates the separation of powers doctrine, equal protection, due process, and is unconstitutional.  Simmons also argues that the trial court erroneously admitted evidence of uncharged sexual offenses and acts of domestic violence under Evidence Code sections 1101, subdivision (b), 1108

---

[1] We use the term "victim" in this opinion to avoid confusion with a witness who shares the same initials.

[2] Unspecified statutory references are to the Penal Code.

and 1109. He further argues that the prosecution's human trafficking expert gave an improper opinion in response to a hypothetical question that closely tracked the facts of the case. Moreover, to the extent these errors are not individually prejudicial, Simmons claims that the cumulative prejudicial impact of the trial court's errors requires reversal of his convictions. Finally, Simmons argues that he is entitled to retroactive application of the mental health diversion statute and that the trial court erred by imposing fines and fees without determining his ability to pay. After briefing in this case was completed, Simmons filed a supplemental brief arguing that his case should be remanded for resentencing in light of recent legislative enactments that ameliorate punishment, Senate Bill No. 567 and Assembly Bill Nos. 124 and 518, which amended sections 1170 and 654.

We agree with Simmons that he is entitled to resentencing in light of Senate Bill No. 567 and reverse the judgment. Because we are remanding for resentencing, Simmons may raise his objections concerning his inability to pay fines and fees to the trial court. We reject his other claims of error.

## I. BACKGROUND

### A. *The Amended Information*

On January 11, 2018, the Santa Clara County District Attorney's Office filed a first amended information charging Simmons with human trafficking of a minor (§ 236.1, subd. (c); count 1), pimping a minor under the age of 16 (§ 266h, subd. (b)(2); count 2), providing or transporting a child for a lewd act (§ 266j; count 3), two counts of unlawful sexual intercourse where the defendant is age 21 or older and the minor is under the age of 16 (§ 261.5, subd. (d); counts 4 & 7), two counts of oral copulation with a minor under the age of 16 (former § 288a, subd. (b)(2); counts 5 & 8), sodomy where the defendant is age 21 or older and the minor is under the age of 16 (§ 286, subd. (b)(2); count 6), two counts of inflicting corporal injury on a cohabitant (§ 273.5, subd. (a); counts 9 & 13), two counts of assault by means of force likely to produce great bodily injury (§ 245,

2

subd. (a)(4); counts 10 & 14), forcible rape (§ 261, subd. (a)(2); count 11), and forcible oral copulation of a minor (former § 288a, subd. (c)(2)(C); count 12). It was further alleged that the count of human trafficking (count 1) involved force, fear, violence, duress, menace, or threat of unlawful injury to the victim. (§ 236.1, subd. (c)(2).)

B. *The Trial*

1. *The Prosecution's Case*

a. *The Charged Offenses*

Around October 2014, victim met Simmons online through a dating website called Fling and started to exchange messages with him.[3] Victim was 15 years old and Simmons was 32 years old at the time. Simmons asked victim if she wanted to make money. He also sent victim his phone number, but victim did not call or text him right away.

In December 2014, victim sent Simmons a message on Fling and told him that she was looking for a roommate. Simmons sent victim his phone number again and asked her what she needed. Victim told Simmons that she was not financially secure, and she was looking for somebody to help her " 'get on [her] feet.' " Victim sent Simmons her phone number, and Simmons asked victim if she wanted him to help her make some money. Victim responded, " 'Yeah, that would be great if you could.' " At the time, victim thought that Simmons's references to making money "had something to do with sleeping with guys." Victim, however, was not ready to engage in prostitution when she first exchanged messages with Simmons over Fling. Victim later sent Simmons a text message and told him that she was 15 years old.

In January 2015, victim met Simmons in person for the first time. Simmons picked victim up at her school in his car and drove her to a hotel. Simmons and victim

---

[3] An expert witness testified that Fling is "advertised as a dating or casual hook up, casual sex connection site" but contains "quite a bit of prostitution activity."

3

had consensual vaginal and anal sex at the hotel. Victim did not think that Simmons knew that he had penetrated her anus during sex. Afterwards, Simmons took victim back to her school.

Victim met Simmons again that same month. Simmons went to victim's school to pick her up, and he took her to a different hotel where they had consensual vaginal and oral sex. Simmons told victim that she could make money by sleeping with other men, but victim did not pay attention to this comment.

A few days later, victim called Simmons. During their conversation, Simmons brought up the topic of making money. Victim understood that Simmons was talking about prostitution.

On February 4, 2015, about a week after their last conversation, victim called Simmons and told him that she was ready to make money. Later that same day, victim called Simmons and told him to come pick her up at a class that she was taking at a church. Simmons drove victim to a store to buy a phone and to a house in Oakland, where they had vaginal sex. Victim's mother filed a missing person's report when she did not return from her class.

The next day, victim received a few calls on her new phone. Simmons drove victim to an "outcall," but nobody showed up at the designated address.[4] Sometime later, Simmons drove victim to meet a "date" in Hayward.[5] Simmons also put an ad for victim's prostitution services on a website called Backpage. Simmons wrote the language of the Backpage ad and gave victim a false name.

After staying in Hayward, Simmons took victim to San Francisco, where he was violent with her for the first time. Simmons became angry after victim failed to pick up

_____

[4] An "outcall" occurs when a prostitute meets the person purchasing sex at his or her location.

[5] The prosecutor later asked victim if the term "dates" referred to "sex acts that the customer pays for." Victim answered yes.

4

some calls on her phone because she was getting ready for the date. Simmons hit victim's face with an open hand three times, threw her onto the bed, and punched her in the back with closed fists. Victim's face became swollen after the assault, and she used a cold towel to try to reduce the swelling. Victim did not want to go forward with the date after Simmons hit her, but she was afraid of Simmons and felt that she was obligated to continue. Simmons told victim that he was going to take her back to her mother. Victim replied that she did not want to go home to her mother, and she had nowhere else to go. Simmons and victim stayed in San Francisco for several days, and victim had at least 10 and possibly more than 20 dates in the city.

After San Francisco, Simmons and victim returned to Hayward for a few days. During that time, Simmons reposted victim's Backpage ad multiple times, and victim went on more than 10 dates.

Simmons and victim then traveled to Sunnyvale, where Simmons was violent with victim a second time. Simmons became angry with victim after she looked at a photograph on her phone that was sent by one of her dates. Simmons hit victim's back and threw her onto the floor and the bed. Shortly afterwards, victim went on a date. Victim wanted to go on the date because being on the date separated her from Simmons.

Simmons was violent with victim a third time late one night in Sunnyvale. Simmons and victim were in bed together, and Simmons insinuated that he wanted victim to perform oral sex on him. Victim said no because she needed to get ready for a date. Simmons slapped victim's face with an open hand and punched victim's arm with a closed fist. Then, he told victim to come over and take her clothes off. Victim complied and performed oral sex on Simmons. Afterwards, Simmons and victim had vaginal sex. Victim did not want to have sex with Simmons, but she also did not want to have another altercation with him. Victim cried on and off while having sex, and she felt like she was forced to have sex with him. Victim estimated that on two or three other occasions, Simmons asked her for oral sex when she made mistakes or got into trouble with him.

5

Simmons was violent with victim a fourth time when she did not follow his directions. Victim could not recall exactly where the assault took place, but she was waiting for Simmons in a hotel room. Simmons had told victim to wait by the window and come down when he pulled his car around the hotel. Victim, however, was unable to see Simmons's car when he first pulled up to the hotel because there was a truck blocking her view. Victim came out of the hotel when she saw Simmons standing outside of his car, waving at her. After victim got into Simmons's car, Simmons struck both sides of her face. Both sides of victim's face became swollen, and she had trouble seeing out of one eye, which became "really blurry." Victim said that the pain from her injuries was "[l]ike a 9, 10" on a scale of one to 10, with 10 being the most painful. The swelling was also "pretty bad" and "obvious." Victim held ice to her injuries for the rest of the evening, and she was unable to go on any dates until the next day.

After their stint in Sunnyvale, Simmons took victim to several other cities, including Fresno and a city near Berkeley. Simmons posted a Backpage ad for victim when they were in Fresno, and victim went on several dates while they were there.

According to victim, Simmons did not set a specific quota for how much money she had to make each day. Simmons and victim discussed reaching a goal of making $10,000, but it was unclear whether there was a set timeframe for victim to meet this goal. Simmons set certain rules for victim which included: setting the rates for victim's dates, and requiring that they wear condoms; requiring victim to tell Simmons when each date started and finished; requiring victim to put the money that she earned under the Bible in the hotel or in the lining of the trash for Simmons to collect; requiring victim to use a false name and a false birthday if she was ever approached by law enforcement; and instructing victim to ask her dates if they were affiliated with law enforcement. Victim had approximately seven dates a day when she was with Simmons. She typically worked from around 5:00 or 6:00 a.m. until midnight, with some breaks in between. On her

6

phone, victim saved Simmons's number under the name "D," which was short for "Daddy."

Victim and Simmons had vaginal sex more than five times when they were together. They also had oral sex more than five times.

When they were together, victim asked Simmons several times if she could contact her family members, but he never gave her permission to do so.[6]

### 2. *The Police Investigation*

#### a. *The Initial Investigation*

On February 12, 2015, Vallejo Police Department Sergeant Drew Ramsay was assigned to victim's case after her mother reported her missing. Victim's mother had found explicit photographs of victim on websites advertising prostitution. Sergeant Ramsay located victim's photographs on other websites, including Backpage, and he took the phone number listed on the Backpage ad and discovered that it belonged to Sprint. Sergeant Ramsay obtained an emergency ping order to locate the phone. On different days, the phone pinged at locations in Sunnyvale and Hayward. Sergeant Ramsay also searched for victim's Backpage ad, and the ad once showed that she was in Fresno.

#### b. *Simmons's Arrest*

Around February 23, 2015, victim exchanged text messages with a police officer who was posing as a prospective date. When the "date" arrived, victim opened the door and saw Santa Clara County District Attorney's Office Investigator Jeff Nichols. Initially, victim was reluctant to speak to the police, and she first gave Investigator Nichols a false name and a false birthday. Victim was scared, and she later cried and became emotional with the officers. Simmons was arrested outside the motel.

---

[6] Victim, however, testified that she reached out to her mother's ex-boyfriend a few days after she had left with Simmons and told him that she was okay.

7

Through the text messages sent between Simmons and victim, officers determined that victim had gone on 73 dates between February 15, 2015, and February 23, 2015.

### c. *The Backpage Ads and Simmons's Fling History*

Investigator Nichols received information from Backpage about victim's ads, including where and when they were placed. The records reflected that in February 2015, there were multiple Backpage ads for victim's services placed in Hayward, San Francisco, Sunnyvale, and Fresno.

Investigator Nichols also served a search warrant on Fling seeking records related to victim's and Simmons's usernames. Simmons discussed " 'making money' " in all of his Fling conversations, which Investigator Nichols interpreted as solicitations for Fling users to engage in prostitution and work for him. Simmons sent messages to several users asking if they were interested in working as an escort. According to Investigator Nichols, "escorting" is often used as a code word for "prostitution."

### d. *Victim's History and Prior Statements*

Victim had a history of running away from home, and she was having problems with her mother. She had once lied and said her mother was physically abusing her. Before victim left with Simmons, she had also communicated with multiple other men on the Fling website. She sent messages on Fling because she wanted to have sex with older men, and she was trying to find someone to help her get away from home. Victim had considered prostituting herself even before she met Simmons and had falsely told Simmons that she had previously engaged in prostitution.

During the preliminary hearing, victim testified that Simmons never hit her or forced her to prostitute herself. Victim also testified that before she met Simmons, she had run away from home and had engaged in prostitution. However, victim testified at trial that she had lied during the preliminary hearing.

Victim had conflicting emotions about Simmons. She was afraid of him, but also felt an emotional connection or friendship with him. Victim felt guilty testifying against

8

Simmons because she did not think it was her place to "judge him over something that happened over a 14-day period of time."

3. ***Expert Testimony***

Investigator Nichols was designated as an expert in human trafficking, pimping, and pandering. He characterized Simmons's activity on the Fling website as pimping and pandering. Based upon a hypothetical set of facts that closely followed the evidence at trial, Investigator Nichols also opined that a hypothetical person would have committed human trafficking.

4. ***Prior Uncharged Sex Offenses and Acts of Domestic Violence***

a. ***D.D.***

D.D. met Simmons in 2004 in Fresno when she was approximately 19 or 20 years old. D.D. had engaged in prostitution before she met Simmons. Simmons was dealing narcotics, and D.D. noticed that other people were taking advantage of him. D.D. told Simmons that he could go to her room if he needed a place to go and gave Simmons her phone number.

Within a couple of days, D.D. and Simmons formed a "boyfriend and girlfriend" relationship. However, the relationship quickly led to physical assaults. About a week after they began their relationship, Simmons slapped D.D. after he counted the money that he made from selling narcotics and came up short.

Shortly thereafter, Simmons was arrested. Simmons told her to prostitute herself so that she could pay his bail. D.D. attempted to follow Simmons's instructions, but he was later released without having to post bail. Simmons again became violent and physically attacked D.D. after hearing that she had been "riding around in his car with somebody else" and smoking methamphetamine. Simmons slapped D.D.'s face and punched her torso several times. Afterwards, Simmons told D.D. to clean herself up because she needed to get ready to work. D.D. began to get dates and prostituted herself on Simmons's behalf.

D.D. wanted to run away, but she did not think she could hide from Simmons. Simmons told D.D. to follow certain rules. D.D. had to stay within Simmons's sight, and she was not allowed to talk to anyone. D.D. had to give Simmons the money that she made from prostitution.

One time, Simmons placed an order at a restaurant and requested that he wanted his meal prepared a specific way. D.D. brought the food back to Simmons, but it was not prepared to Simmons's satisfaction, so he threw a metal can at D.D., which struck her shoulder.

D.D. estimated that she went on 30 dates while she was with Simmons. Sometimes, Simmons forced D.D. to go on dates. D.D. was also expected to earn a quota of $500 per day. If D.D. did not meet her quota, she was expected to work longer hours. One time, D.D. worked for almost 48 hours to make her quota. If D.D. returned before she met her quota, Simmons would hit and choke her. Once, Simmons grabbed D.D. by the throat and strangled her until she almost passed out.

At a certain point, Simmons was arrested again by the police, and D.D. went to the other side of town to get a room with the help of an ex-boyfriend. After he was released, Simmons found D.D. and became angry. Simmons broke the window so he could open the door to D.D.'s room. He dragged her out of the room by her hair and punched her torso and face several times with a closed hand. Simmons took D.D. to a friend's house, put D.D. naked in the bathtub, lit a cigarette, and placed the cigarette on her left forearm, burning her. Simmons took a hammer and told D.D. that she should have her teeth knocked out. He then punched her in the face several more times. Simmons insinuated to D.D. that he caused someone to go missing in Clovis, a nearby city. Afterwards, D.D. became even more fearful of Simmons.

Another time, D.D. asked Simmons if he was seeing any women behind her back, and Simmons "snapped" and grabbed D.D.'s neck and throat. Simmons also once used a telephone cord to strangle D.D. She had to use her fingernails and clawed Simmons's

10

arm to get him to stop.  Simmons also told D.D. that nobody would know if anything happened to her.  Toward the end of D.D.'s time with Simmons, he took away her cell phone and her money.

During the one or two months that they were together, D.D. estimated that Simmons assaulted her approximately 20 to 25 times.  D.D. later asked a police officer for help to get away from Simmons.

### b. *L.D.*

L.D. met Simmons in 2010 when she worked as a prostitute in San Jose.  L.D. was around 21 years old at the time.  L.D. saw that Simmons had been pulled over by the police and offered him a place to stay.  Simmons went to L.D.'s room, and they had consensual sex.  Simmons told L.D. that she could make more money if she went to Southern California or Los Angeles.  Simmons offered to bring L.D. there and back to San Jose in time to pick up her two-year-old son.

L.D. agreed to go with Simmons, and she was with him for approximately three or four days, from Friday to Monday.  Simmons drove L.D. to Anaheim.  Simmons told L.D. that she should wear a dress, heels, and makeup.  L.D. could not recall the exact number of dates that she went on when she was with Simmons.  She estimated that she probably went on more than eight dates on Saturday.  L.D. asked Simmons if she could keep some of the money that she earned, but Simmons told L.D. that he needed to fix his car.  Simmons arranged for dates by posting ads on websites like Craigslist and Backpage.

Simmons physically assaulted L.D. multiple times when they were together.  Simmons slapped L.D.'s face and the side of her body, and sometimes caused her nose and lips to bleed.  L.D. told Simmons that she wanted to go home, but Simmons replied that L.D. had to finish making money.  L.D. also told Simmons multiple times that she needed to pick up her son.  L.D. was afraid of Simmons, and she once tried to call 911 for help.

11

L.D. eventually told a date about what was happening with Simmons and asked the date to call law enforcement.

c. **_D.M.D._**

D.M.D. met Simmons on the OkCupid dating website in 2014 when she was around 23 years old. She communicated with Simmons for two weeks before arranging to meet with him in person at his apartment in San Francisco, where they had consensual sex.

Afterwards, D.M.D. told Simmons that she needed to get back to her two-year-old daughter, who was being watched by a friend. D.M.D.'s friend had sent her messages saying that her friend's parents were going to call Child Protective Services (CPS) because D.M.D. had been gone longer than expected and D.M.D. was not answering her phone. D.M.D. was sending text messages to her friend when Simmons took her phone away from her. D.M.D. started to cry and scream because she was afraid that CPS had already gotten involved. She asked Simmons to give her a ride back home or order her a taxi. Simmons punched D.M.D.'s face using a closed fist, hard enough that D.M.D. heard ringing in her ears. He also punched D.M.D. in the stomach and back. Eventually, D.M.D. fell to the floor. In total, Simmons struck D.M.D. seven or eight times.

Simmons told D.M.D. to take her clothes off, and instructed D.M.D. to put on his clothing. Simmons went through D.M.D.'s wallet and took the money that was in her purse. Simmons also took D.M.D.'s debit card and "made" her use the computer to access her bank account so he could see how much money she had. D.M.D. told Simmons that she did not remember her bank password.

Simmons left the apartment and took D.M.D.'s clothes to the laundromat to wash them. After Simmons returned from the laundromat, he "made" D.M.D. log into her bank account again. D.M.D. asked to see her phone, and Simmons told her that she was not allowed to have her phone. D.M.D. told Simmons that she needed to get back to her daughter, and Simmons replied that D.M.D. did not deserve to be a mother because she

12

was out with him and not with her daughter. Simmons then told D.M.D. that he was going back to the laundromat to dry her clothes.

After Simmons left, D.M.D. waited for approximately 20 minutes before she ran out of the apartment. D.M.D. went to a nearby apartment building, knocked on the door, and asked someone to call 911.[7]

### d. *P.D.*

P.D. met Simmons through a phone chat line in 2009 when she was around 14 years old. Simmons told P.D. that he was 17 years old. P.D. told Simmons where she lived, and he came to meet her at her school. P.D. got into Simmons car, and Simmons drove her to a house in the Oakland area.

P.D. and Simmons watched television together. Later, Simmons asked P.D. to go upstairs and asked her to get "naked for him." P.D. initially refused. Simmons then used "peer pressure" to get P.D. to comply, and he touched her and reached under her shirt. P.D. continued to tell Simmons no, but he unbuttoned her pants. P.D. tried to move Simmons's hand, but he was stronger than her. P.D. continued to tell Simmons no. Simmons had vaginal sex with P.D. P.D. laid there and waited "for it to be over." At one point, P.D. tried to push Simmons off.

Afterwards, P.D. went to the bathroom. Simmons asked P.D. why she was crying, and she responded that she was not crying. P.D. and Simmons had sex again. P.D. did not say no to Simmons this second time, but she did not want to have sex with him. P.D. did not resist because she knew what would happen, and she did not think it was necessary to fight him.

Afterwards, Simmons dropped P.D. off at a BART station. P.D. immediately told one of her friends about what had happened, and she later reported the incident to the police.

---

[7] An audio recording of D.M.D.'s 911 call was played for the jury.

13

## 2. *The Defense Case*

Simmons called victim to testify as part of his defense. Victim testified that before she met Simmons, she posted an ad as an "escort" on Backpage that falsely indicated that she was 19 years old. According to victim, "escort" referred to prostitution services. The ad described the services that victim was willing to offer and included pricing. The ad stated, " 'I am a professional escort.' " Victim, however, could not recall getting any calls in response to her ad.

## 3. *Stipulations*

The parties stipulated to the following: (1) On March 18, 2005, Simmons was convicted in Fresno County of selling a person for illicit use and two counts of domestic violence causing corporal injury; (2) On October 27, 2010, Simmons was convicted in Orange County of two counts of pimping, pandering, selling a person for illicit use, and misdemeanor battery, and two misdemeanor battery charges resulted in a hung jury; (3) On August 29, 2014, Simmons was convicted in San Francisco County of attempted pandering.[8]

## C. *The Verdict and Sentencing*

On February 14, 2018, the jury found Simmons guilty of all the charged counts and allegations, except it was unable to reach a verdict as to count 6, sodomy where the defendant is age 21 or older and the victim is under the age of 16 (§ 286, subd. (b)(2)). The trial court dismissed count 6 on the prosecutor's motion.

---

[8] The record reflects that the 2005 Fresno County convictions were for the uncharged acts involving D.D., the 2010 Orange County convictions were for the uncharged acts involving L.D., and the 2014 San Francisco County conviction was for the uncharged acts involving D.M.D.

14

On June 4, 2018, the trial court sentenced Simmons to 15 years to life for his conviction of human trafficking of a minor by force or fear (§ 236.1, subd. (c); count 1), consecutive to a determinate term of 28 years for his remaining convictions.[9]

The trial court imposed a restitution fine of $300 under section 1202.4, subdivision (b) and imposed and stayed a matching parole revocation restitution fine under section 1202.45. The trial court further imposed a $520 court operations fee under section 1465.8, a $390 criminal conviction assessment under Government Code section 70373, and a $300 sex offender fine plus penalty assessments under section 290.3.

## II. DISCUSSION

### A. Challenges to Section 236.1, subdivision (c)

Simmons raises several challenges to his conviction of human trafficking under section 236.1, subdivision (c). He argues that the statute violates California's separation of powers doctrine and further violates federal and state principles of equal protection

---

[9] The determinate term of 28 years was composed of the following: four years for unlawful intercourse where the defendant is age 21 or older and the minor is under the age of 16 (§ 261.5, subd. (d); count 4), three years concurrent for oral copulation with a minor under the age of 16 (former § 288a, subd. (b)(2); count 5), one year for unlawful intercourse where the defendant is age 21 or older and the minor is under the age of 16 (§ 261.5, subd. (d); count 7), three years concurrent for oral copulation with a minor under the age of 16 (former § 288a, subd. (b)(2); count 8), one year for inflicting corporal injury on a cohabitant (§ 273.5, subd. (a); count 9), four years concurrent for assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 10), one year for inflicting corporal injury on a cohabitant (§ 273.5, subd. (a); count 13), four years concurrent for assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 14), 11 years for forcible rape (§ 261, subd. (a)(2); count 11), and 10 years for forcible oral copulation of a minor (former § 288a, subd. (c)(2)(C); count 12). In sum, the trial court imposed upper terms for counts 4, 5, 8, 10, 11, 12, and 14. The trial court also imposed and stayed upper sentences of eight years for pimping a minor under the age of 16 (§ 266h, subd. (b)(2); count 2) and eight years for providing or transporting a child for a lewd act (§ 266j; count 3) under section 654.

15

and due process.[10]  We review the constitutionality of a statute de novo.  (*People v. Scott* (2016) 3 Cal.App.5th 1265, 1271-1272 (*Scott*).)  As we explain, we find no merit to his arguments.

### 1. *Separation of Powers*

First, Simmons argues that section 236.1, subdivision (c) violates the separation of powers doctrine.  Simmons argues that as worded, conduct that violates sections 266i, subdivision (b) (pandering a minor) or 266h, subdivision (b) (pimping a minor) would also violate section 236.1, subdivision (c), but the statutes authorize vastly different punishments.[11]  Thus, Simmons claims that the prosecutor's decision to charge a crime as human trafficking under section 236.1, subdivision (c) intrudes upon the judiciary's core function to impose appropriate sentences in criminal cases.  We agree with Simmons that the above statutes generally criminalize the same conduct, but we determine that he fails to establish a violation of the separation of powers doctrine.

Section 266i, subdivision (a) provides in pertinent part that a person who procures another individual for prostitution or does so by promises, threats, violence, or induces another person to become a prostitute, is guilty of pandering.  (§ 266i, subd. (a)(1)-(2).)  Section 266i, subdivision (b) provides that a person who does any of the acts described under subdivision (a) with a person who is a minor is guilty of pandering a minor and is subject to different criminal penalties depending on the minor's age.  (§ 266i, subd. (b).)

---

[10] The Attorney General argues that Simmons has forfeited his separation of powers claim because he did not raise it in the trial court.  Assuming that his arguments are not forfeited, we find them to be without merit as explained below.

[11] The crime of human trafficking under section 236.1, subdivision (c) is punishable by imprisonment for 15 years to life and a fine of not more than $500,000 when the offense involves force or fear.  (§ 236.1, subd. (c)(2).)  The crime of pandering a minor is punishable by imprisonment for three, six, or eight years if the victim is under 16 years of age.  (§ 266i, subd. (b)(2).)  The crime of pimping a minor under section 266h is punishable by imprisonment for three, six, or eight years if the victim is under 16 years of age.  (§ 266h, subd. (b)(2).)

16

Section 266h, subdivision (b) provides that a person who derives support or maintenance from the proceeds of a person's prostitution is guilty of pimping a minor if the person is a minor. Section 236.1, subdivision (c) provides in pertinent part that "[a] person who causes, induces, or persuades, or attempts to cause, induce, or persuade, a person who is a minor at the time of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of Section . . . 266h, 266i . . . is guilty of human trafficking."

Under the California Constitution, the separation of powers doctrine provides that "[t]he powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." (Cal. Const., art. III, § 3.) "[T]he separation of powers doctrine prohibits the legislative branch from granting prosecutors the authority, *after* charges have been filed, to control the legislatively specified sentencing choices available to the court. A statute conferring upon prosecutors the discretion to make certain decisions *before* the filing of charges, on the other hand, is not invalid simply because the prosecutor's exercise of such charging discretion necessarily affects the dispositional options available to the court. Rather, such a result generally is merely incidental to the exercise of the executive function—the traditional power of the prosecutor to charge crimes." (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 553 (*Manduley*).)

In this case, section 236.1, subdivision (c) does not confer the prosecutor with the ability to control the sentencing choices available to the trial court *after* charges have been filed. Rather, it permits the prosecutor to make a discretionary decision *before* charges are filed to prosecute a case under section 236.1, subdivision (c) or under sections 266i and 266h. Under *Manduley*, this is not a violation of the separation of powers doctrine. (*Manduley*, *supra*, 27 Cal.4th at p. 553.)

Simmons acknowledges the California Supreme Court's decision in *Manduley*, but he argues that "the disparity in sentencing between the pandering and human

17

trafficking statutes, particularly in the case of minors, is so extreme" that section 236.1, subdivision (c) must be interpreted as intruding upon the judiciary's function to set appropriate sentences. However, Simmons does not cite to any authority for the proposition that the separation of powers is necessarily implicated merely because different statutes that criminalize the same conduct have vastly different punishments. In fact, *Manduley* stated that the separation of powers doctrine " 'recognizes that the three branches of government are interdependent, and it permits actions of one branch that may "significantly affect those of another branch." ' " (*Manduley*, *supra*, 27 Cal.4th at p. 557.) In this case, the prosecutor's decision to charge a crime under section 236.1, subdivision (c) significantly impacts the trial court's sentencing choices *after* a defendant is convicted, but the prosecutor's discretion to charge crimes does not usurp the judiciary's function.

In sum, we find no merit in Simmons's claim that section 236.1, subdivision (c) violates the separation of powers doctrine.

2. ***Equal Protection and Due Process***

Next, Simmons argues that the vastly different punishments authorized by sections 236.1, subdivision (c) and 266i, subdivision (b) violate federal and state principles of equal protection and due process. We disagree and find no equal protection or due process violation.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." (*City of Cleburne v. Cleburne Living Center* (1985) 473 U.S. 432, 439.) Likewise, the California Constitution states that "[a] person may not be . . . denied equal protection of the laws." (Cal. Const., art. I, § 7, subd. (a).)

Simmons argues that by violating section 236.1, subdivision (c) with force or fear, he is similarly situated to a defendant who is prosecuted solely for pandering a minor

18

under section 266i, subdivision (b), but he faces a vastly harsher mandatory sentence of 15 years to life. Similar arguments have been rejected by the California Supreme Court, which has concluded that "neither the existence of two identical criminal statutes prescribing different levels of punishments, nor the exercise of a prosecutor's discretion in charging under one such statute and not the other, violates the equal protection principles." (*People v. Wilkinson* (2004) 33 Cal.4th 821, 838 [statute criminalizing battery on custodial officer did not violate equal protection principles]; see *United States v. Batchelder* (1979) 442 U.S. 114, 124-125.) *Wilkinson* determined that "so long as there is no showing that a defendant 'has been singled out deliberately for prosecution on the basis of some invidious criterion,' that is, ' "one that is arbitrary and thus unjustified because it bears no rational relationship to legitimate law enforcement interests[,]" ' the defendant cannot make out an equal protection violation." (*Wilkinson*, *supra*, at pp. 838-839; *Batchelder*, *supra*, at p. 125 [prosecutor may be influenced by penalties available upon conviction "but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause"].) Here, Simmons's equal protection claim fails because he does not allege that his prosecution was " 'motivated by improper considerations.' " (*Wilkinson*, *supra*, at p. 839.)

We also find no merit in Simmons's due process argument. Simmons argues that his federal due process rights require that the disposition of his case complies with the California Constitution, including the separation of powers doctrine. In other words, Simmons's due process claim is premised on his assertion that section 236.1, subdivision (c) violates the separation of powers doctrine, which we have rejected. Accordingly, we must also reject Simmons's due process claim.

B. *Evidence of Uncharged Sexual Offenses and Acts of Domestic Violence*

Simmons argues that the trial court erroneously admitted evidence of uncharged sexual offenses and acts of domestic violence under Evidence Code sections 1108 and 1109. He argues that Evidence Code sections 1108 and 1109 are unconstitutional, and, in

19

any event, the trial court abused its discretion under Evidence Code section 352 when it admitted evidence of his prior acts. We conclude that the trial court did not err when it admitted evidence of the uncharged acts.

1. ***Background***

Before trial, the prosecutor filed a motion in limine seeking to introduce evidence of Simmons's prior acts and convictions. The prosecutor's motion argued that D.D., L.D. and D.M.D. should be permitted to testify under Evidence Code section 1101, subdivision (b) to show Simmons's intent to commit sexual offenses against victim. The prosecutor also argued that the "prior incidents/convictions of domestic violence in the 2004 and 2010 cases," which involved D.D. and L.D., should be admissible against Simmons under Evidence Code section 1109. Finally, the prosecutor argued that Simmons's prior sexual offenses against P.D. should be admitted under Evidence Code section 1108.

Simmons filed a motion in limine to exclude evidence of his prior acts. In part, Simmons argued that Evidence Code sections 1108 and 1109 violate principles of equal protection and due process.

At a pretrial hearing, the prosecutor stated that for counts 1 through 3, he intended to offer the prior acts involving D.D., L.D., D.M.D., and P.D. under Evidence Code section 1101, subdivision (b) to show a common design or plan, intent, motive, knowledge, and, to a "more minimal degree," preparation and opportunity. For counts 4 through 8, he intended to offer the prior acts involving P.D. under Evidence Code section 1101, subdivision (b). For counts 9, 10, 13, and 14, he intended to offer the prior acts of domestic violence involving D.D., L.D., and D.M.D. under Evidence Code section 1109. Finally, for counts 4 through 8, 10, and 11, he intended to offer the prior sexual offenses involving P.D. under Evidence Code section 1108. In response, Simmons argued that the evidence of his prior acts would be "extremely confusing" to the jury, and the evidence should be excluded under Evidence Code section 352.

20

After considering the parties' arguments, the trial court made the following ruling: "I have considered the arguments of the parties with respect to this other-acts type of evidence. I've read the offers of proof that are contained within the People's in limine motions and statement of facts. I've looked at the way in which it has been delineated and described for purposes of each particular count and the reasons, therefore, and I balanced all of this under Evidence Code Section 352 balancing the probative value of the evidence to be offered for the various purposes with the concerns of substantial prejudice, undue consumption of time, confusion of the issues, et cetera. [¶] I do find that the People should be entitled to introduce this evidence under the various theories for which they have proffered it . . . ."

## 2. *Constitutionality of Evidence Code Sections 1108 and 1109*

Simmons argues that Evidence Code sections 1108 and 1109 are unconstitutional and violate principles of due process. We review this claim de novo. (*Scott*, *supra*, 3 Cal.App.5th at pp. 1271-1272.) And as we explain, we find that it is without merit.

"Character evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159; Evid. Code, § 1101, subd. (a).) However, the Legislature has created certain exceptions to the prohibition against admitting propensity evidence in cases involving sexual offenses (Evid. Code, § 1108, subd. (a)) and domestic violence (*id.*, § 1109, subd. (a)(1)).

Simmons acknowledges that the California Supreme Court rejected the argument that Evidence Code section 1108 violates a defendant's right to due process in *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*).[12] *Falsetta* held that "the trial court's discretion to exclude propensity evidence under [Evidence Code] section 352 saves [Evidence

---

[12] The California Supreme Court recently declined to revisit *Falsetta* in *People v. Baker* (2021) 10 Cal.5th 1044, 1089-1090 (*Baker*).

21

Code] section 1108 from [a] due process challenge." (*Id.* at p. 917.) Although the California Supreme Court has not specifically ruled on the constitutionality of Evidence Code section 1109, which is a parallel provision to Evidence Code section 1108, Courts of Appeal have consistently concluded that Evidence Code section 1109 does not violate principles of due process under the reasoning in *Falsetta*. (See, e.g., *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1024 (*Hoover*); *People v. Johnson* (2000) 77 Cal.App.4th 410, 420.)

We are bound by the Supreme Court's decision in *Falsetta* and conclude that Evidence Code section 1108 is constitutional. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450.) Likewise, we find that *Falsetta*'s analysis applies to Evidence Code section 1109 and reject Simmons's due process claim. (*Hoover*, *supra*, 77 Cal.App.4th at p. 1024.)

### 3. *Admission of Uncharged Acts Under Evidence Code Section 352*

Simmons contends that the trial court abused its discretion when it admitted P.D.'s testimony under Evidence Code section 1109 and the testimony of D.D., L.D., and D.M.D. under Evidence Code section 1108 because the evidence was substantially more prejudicial than probative under Evidence Code section 352. Simmons argues that many of the prior acts were dissimilar to his current charges. Moreover, he argues that some of his prior acts were remote in time. Simmons does not specifically identify acts that should have been excluded, nor does he expressly articulate at what point the evidence became more prejudicial than probative. Instead, he generally argues that all the uncharged sex offenses and acts of domestic violence should have been excluded. As we explain, we disagree and conclude that the trial court did not abuse its discretion by admitting the prior acts evidence.

### a. *General Legal Principles and Standard of Review*

As we previously stated, the Legislature created certain exceptions to the general prohibition against propensity evidence in cases involving sexual offenses (Evid. Code,

§ 1108, subd. (a)) and domestic violence (*id.*, § 1109, subd. (a)(1)), so long as the evidence is admissible under Evidence Code section 352. Evidence is admissible under Evidence Code section 352 if its probative value is not "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "We apply the deferential abuse of discretion standard when reviewing a trial court's ruling under Evidence Code section 352." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)

A trial court " 'must engage in a careful weighing process under section 352' when admitting propensity evidence." (*Baker*, *supra*, 10 Cal.5th at p. 1098, quoting *Falsetta*, *supra*, 21 Cal.4th at p. 917.) "Rather than admit or exclude every . . . offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other . . . offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta*, *supra*, at p. 917; *Baker*, *supra*, at pp. 1098-1999 [applying factors described in *Falsetta* to determine whether evidence admitted under Evid. Code, §§ 1108 and 1109 should have been excluded under Evid. Code, § 352].) " ' "[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352." ' " (*People v. Doolin* (2009) 45 Cal.4th 390, 438.)

b. ***Relevant Factors***

Simmons argues that applying the factors described in *Falsetta*, all the prior uncharged acts should have been excluded as substantially more prejudicial than probative. We proceed to address the various factors relevant to the admissibility of the evidence.

First, we conclude that the evidence of the uncharged acts was probative because the acts were similar to the charged offenses. " ' "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense." ' " (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531 (*Johnson*); *Falsetta*, *supra*, 21 Cal.4th at p. 917 [trial court should consider factors including "similarity to the charged offense"].)

Simmons argues that the probative value of the evidence was low because the uncharged acts were dissimilar to the charged offenses. He claims that the acts involving P.D. were dissimilar to the sexual offenses that he committed against victim because his initial encounter with P.D. was violent from the start and P.D. testified that Simmons forcibly had sex with her while she repeatedly said "no." In contrast, Simmons argues that his relationship with victim was initially consensual.

We agree with Simmons that the acts involving P.D. were not identical to the sexual offenses that Simmons committed against victim. Nonetheless, Simmons's argument ignores the striking similarities between the acts involving P.D. and the charged crimes. Simmons met P.D. and victim, who were both teenagers at the time, through anonymous channels—P.D. through a phone chat line and victim through the Internet. Both P.D. and victim described that Simmons met them at their schools and drove them to a more secluded location to have sex. Although Simmons argues that his conduct with P.D. was violent from the start, P.D. testified that she and Simmons initially watched television together at a house, and Simmons first used "peer pressure" to get P.D. to comply with his sexual advances. Simmons argues that victim's testimony, unlike P.D.'s testimony, did not contain explicit descriptions to resistance to Simmons's sexual

24

advances, but victim testified that after the third time Simmons was violent with her, she had vaginal sex with Simmons while intermittently crying. Contrary to Simmons's argument, there is evidence that Simmons forced himself on both P.D. and victim against their will. Thus, the record reflects that in both situations, Simmons met an underaged girl, befriended her, and made initially innocuous advances that ultimately led to forcible sex. The fact that P.D. said no to Simmons from the start does not render the acts substantially dissimilar to the offenses committed against victim.

Simmons claims that the acts of domestic violence described by L.D., D.D., and D.M.D. were "more intense and severe" than the violence inflicted on victim by Simmons, which rendered the acts dissimilar to the charged offenses and created the potential for prejudice. For example, D.D. testified that Simmons punched her multiple times in the abdomen and once threw a can at her shoulder. D.D. also testified that Simmons used a cigarette to burn her arm and choked her. L.D. testified that Simmons slapped her and hit the side of her body using both an open hand and a closed fist. Finally, D.M.D. testified that Simmons once punched her in the face, abdomen, and back multiple times, causing bruising.

We disagree with Simmons's characterization of the uncharged acts of domestic violence as being dissimilar. Victim described multiple acts of domestic violence where Simmons slapped her with an open hand, punched her back with closed fists, and picked her up and threw her down. Simmons's assaults against victim also resulted in injuries, and on one occasion, victim described that she even had difficulty seeing out of one eye because of swelling.

Furthermore, the prior acts of domestic violence against L.D., D.D., and D.M.D. were highly probative because they shared multiple characteristics with the charged conduct against victim. The acts involving L.D. and D.D. involved Simmons assaulting a woman that he was intimate with and was pimping. As with victim, Simmons's violence against L.D., D.D., and D.M.D. often erupted after they did something of which he

25

disapproved. Moreover, the fact that Simmons engaged in multiple acts of domestic violence against four different women (L.D., D.D., D.M.D., and victim) that he had a sexual relationship with "*strengthens* its probative value on propensity." (*People v. Merchant* (2019) 40 Cal.App.5th 1179, 1194 (*Merchant*).)

Simmons insists that the sheer number of prior acts made the evidence highly prejudicial. On the contrary, the numerous prior acts of domestic violence enhanced the evidence's probative strength and did not necessarily render the acts unduly prejudicial. (*People v. Kerley* (2018) 23 Cal.App.5th 513, 536 ["it is the frequency, regularity, and severity with which [defendant] beat [the prior victim] that infuses this propensity evidence with probative strength"]; see *Merchant*, *supra*, 40 Cal.App.5th at pp. 1193-1194 [trial court did not abuse its discretion in admitting eight prior acts of domestic violence]; see also *Baker*, *supra*, 10 Cal.5th at pp. 1090-1100 [trial court did not abuse discretion in admitting multiple prior uncharged acts committed against six victims under Evid. Code, §§ 1108, 1109, and 1101].) Evidence Code section 1109 "reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are 'uniquely probative' of guilt in a later accusation. [Citation.] Indeed, proponents of the bill that became section 1109 argued for admissibility of such evidence because of the 'typically repetitive nature' of domestic violence." (*Johnson*, *supra*, 185 Cal.App.4th at p. 532.) In this case, Simmons's numerous prior acts of domestic violence was compelling evidence of his propensity to react angrily and violently toward his intimate partners when they disobeyed him or did something of which he disapproved.

Second, the extent of victim's injuries demonstrates the nature of the charged acts of domestic violence were not significantly less inflammatory compared with the uncharged acts, and it is unlikely that evidence of the uncharged acts would have caused undue prejudice. (*People v. Branch* (2001) 91 Cal.App.4th 274, 283-284 [unlikely that jury would have been prejudiced by "inflammatory" testimony about prior uncharged offenses because of similarity to the charged offenses] (*Branch*).) And even if the

uncharged acts were somewhat more inflammatory than the charged offenses, they were neither extreme nor misleading. (*People v. Harris* (1998) 60 Cal.App.4th 727, 738 [evidence was "inflammatory *in the extreme*"] (*Harris*); see also *People v. Christensen* (2014) 229 Cal.App.4th 781, 799 [prior offense was "more severe" than charged offenses but "not so much so that it should be excluded without a consideration of other factors"].)

Third, we find that the probative value of the evidence was further enhanced because the evidence came from sources independent of the charged offenses, the testimonies of L.D., D.D., D.M.D., and P.D. (*Falsetta*, *supra*, 21 Cal.4th at p. 917 [probative value of uncharged offense is increased by independent sources of evidence].)

Fourth, we consider whether the absence of a criminal conviction for the uncharged sexual offense involving P.D. weighs in favor of exclusion. (See *Falsetta*, *supra*, 21 Cal.4th at p. 917 [trial court must consider "the likelihood of confusing, misleading, or distracting the jurors from their main inquiry"].) There was nothing in the record that indicated that Simmons was charged or convicted of crimes stemming from the incidents involving P.D., which raises the potential for prejudice. (*People v. Tran* (2011) 51 Cal.4th 1040, 1047 ["prejudicial effect of [uncharged act] evidence is increased" if there is no criminal conviction].)

Simmons acknowledges that he was convicted of crimes related to the acts involving D.D., L.D., and D.M.D., but he expresses concerns that some jurors may have felt compelled to punish him further for his uncharged acts because the record reflects that he received only minimal criminal sanctions for his many offenses. In part, Simmons relies on *Harris*, *supra*, 60 Cal.App.4th 727. In *Harris*, the Court of Appeal held that the jury may have concluded that the "defendant escaped appropriate rape charges" when it was told that the defendant was convicted solely of burglary in connection with a prior act that involved both a burglary and a sexual assault. (*Id.* at p. 738.) We acknowledge that Simmons was not convicted of crimes for every act that D.D., L.D., and D.M.D. described during trial. For example, it appears that Simmons

27

was convicted in 2014 of one count of attempted pandering for the acts that involved D.M.D., but D.M.D. testified that Simmons also physically assaulted her.

Any prejudice, however, was allayed at least in part by the fact that the jury was expressly told not to consider punishment in its deliberations, and we presume that it followed this instruction. (See *People v. Thomas* (2011) 51 Cal.4th 449, 487.) Furthermore, the potential for prejudice from the absence of prosecution is but one factor for the trial court to consider when it weighs whether to admit evidence under Evidence Code sections 1108 and 1109. This factor, however, is not by itself determinative.

Fifth, we find that "the burden on the defendant in defending against the uncharged offense" does not weigh in favor of excluding the evidence. (*Falsetta*, *supra*, 21 Cal.4th at p. 917.) Simmons disagrees and argues that the evidence was unduly prejudicial because the number of prior acts and the passage of time since the acts were committed made it difficult for him to mount an appropriate defense. This argument, however, is not supported by the record. Simmons concedes that he was on notice of the charged offenses and knew the identity of the witnesses before trial. Yet there is nothing in the record to indicate that Simmons sought a continuance to investigate the uncharged acts, nor is there anything in the record to support Simmons's claim that it was impossible for him to effectively challenge the propensity evidence. In fact, the majority of the uncharged acts (D.M.D. in 2014, L.D. in 2010, and P.D. in 2009) were not significantly remote in time compared to the charged offenses, which took place in 2015.

Sixth, we conclude that the "degree of certainty" of the commission of the uncharged acts also does not weigh in favor of exclusion. (*Falsetta*, *supra*, 21 Cal.4th at p. 917.) Simmons argues that the alleged prior acts were solely established by the testimonies provided by D.D., L.D., D.M.D., and P.D. which does not equal certainty of commission. This argument ignores the other evidence in the record that supported the uncharged acts. As we have stated, there was evidence that Simmons was convicted of crimes for some of the acts he committed against D.D., L.D. and D.M.D. Furthermore,

28

an audio recording of D.M.D.'s 911 call was played for the jury. It is true, as Simmons points out, that the majority of evidence came from the witnesses' respective testimonies. However, it was up to the jury to assess the credibility of D.D., L.D., D.M.D., and P.D. and decide whether to believe them. (See *People v. Maury* (2003) 30 Cal.4th 342, 403 [determination of witness credibility within the exclusive province of jury].) Based on this record before us, we cannot say that the testimonies provided by D.D., L.D., D.M.D., and P.D. were equivocal or lacked certainty.

Seventh, we determine that the "possible remoteness" of the prior acts do not render them unduly prejudicial. (*Falsetta*, *supra*, 21 Cal.4th at p. 917.) Simmons disagrees and specifically claims that the remoteness of the acts involving D.D., which date back to 2004 (11 years before the charged offenses), warranted their exclusion.

Evidence Code section 1109, subdivision (e) provides that "[e]vidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice." Although the statute establishes a presumption that domestic violence acts committed 10 years before the charged conduct is inadmissible, the statute also "clearly anticipates that some remote prior incidents will be deemed admissible and vests the court with substantial discretion in setting an 'interest of justice' standard." (*Johnson*, *supra*, 185 Cal.App.4th at p. 539.) "[T]he 'interest of justice' exception is met where the trial court engages in a balancing of factors for and against admission under [Evidence Code] section 352 and concludes . . . that the evidence was 'more probative than prejudicial.'" (*Id*. at pp. 539-540.) "To the extent a higher degree of scrutiny is called for, it is the conclusion drawn from the balancing test, not the process itself, that must change under subdivision (e)." (*Id*. at p. 539.) Thus, under the "interest of justice" exception, evidence is admissible when the "probative value [of the prior acts] weighs more heavily on [the] same scales [as Evidence Code section 352]." (*Ibid*.)

Simmons notes that the trial court made no express finding on whether the acts involving D.D., which were more remote than the other uncharged acts, should be admitted in the interest of justice. As a general rule, however, " ' "a trial court is presumed to have been aware of and followed the applicable law." ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 398.) In this case, the striking similarities between the present acts and the acts involving D.D. supported the trial court's implied finding that admitting the evidence was in the interest of justice. D.D., like victim, first had a consensual sexual relationship with Simmons that evolved into a relationship where Simmons acted as D.D.'s pimp. The relationship then went through cycles where Simmons engaged in violence against D.D. when D.D. did something of which Simmons disapproved.

Additionally, there is no specific time limit that establishes when a prior act is so remote that it becomes inadmissible. (See *Branch*, *supra*, 91 Cal.App.4th at p. 284 [trial court did not abuse discretion in admitting evidence of prior act that was committed 30 years before charged conduct].) The trial court in this case could have reasonably determined that the multiple other prior acts of domestic violence committed against L.D. (2010) and D.M.D. (2014) that occurred during the intervening years meant that the remoteness of the prior acts of domestic violence against D.D. in 2004 did not render the evidence significantly less probative. (See *Johnson*, *supra*, 185 Cal.App.4th at p. 534 [remote prior conduct is less probative of propensity than more recent misconduct "especially . . . if the defendant has led a substantially blameless life in the interim"].) Thus, the remoteness of the acts involving D.D. do not weigh in favor of excluding the evidence.

c. *The Evidence Code Section 352 Analysis*

After carefully considering the record, we conclude that the trial court did not abuse its discretion when it admitted evidence of the uncharged offenses under Evidence Code sections 1108 and 1109. In fact, the trial court carefully considered Simmons's

30

motions and performed the required weighing under Evidence Code section 352. Certainly, the evidence of the prior uncharged acts was significant. However, the prejudice contemplated by Evidence Code section 352 " 'is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes the evidence relevant. . . . " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " ' " (*People v. Doolin*, *supra*, 45 Cal.4th at pp. 438-439.)

Based on the totality of the circumstances, Simmons has not demonstrated that the probative value of the prior uncharged acts was substantially outweighed by the risk of undue prejudice under Evidence Code section 352. The record does not reflect that the trial court exercised its discretion " 'in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice' " when it admitted the evidence. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)[13]

C. *Improper Expert Opinion*

Simmons argues that Investigator Nichols invaded the province of the jury and improperly opined that a hypothetical 32-year-old male who committed acts that closely

---

[13] Simmons also argues that the evidence of his prior acts should not have been admitted under Evidence Code section 1101. We do not need to reach this argument because we have found the evidence was admissible under Evidence Code sections 1108 and 1109. (See *Branch*, *supra*, 91 Cal.App.4th at pp. 280-281.)

Furthermore, we find no merit to Simmons's derivative due process claim that admission of the prior acts rendered his trial fundamentally unfair because evidence of the uncharged acts was irrelevant or unduly prejudicial. As we have concluded, the uncharged acts were relevant and admitting the evidence did not cause undue prejudice under Evidence Code section 352.

tracked the facts of Simmons's case was a pimp and a human-trafficker. We conclude that the trial court properly admitted Investigator Nichols's expert opinion.

### 1. *Background*

During trial, the prosecutor asked Investigator Nichols a lengthy and detailed hypothetical question that closely tracked the facts of the current case.[14] The prosecutor

---

[14] The prosecutor asked: "The situation is you have a 15-year-old girl[] she meets a guy online. He's 32 that guy brings up making money. Says I want to get some money. He asks for a cell phone number, her cell phone number. He's persistent. She says she's looking for a roommate in the correspondence. She also says, 'Well, right now I'm not in the best position financially. I'm not looking to use anybody or live off of them. I just need somebody to help me get on my feet if not, I can completely understand and maybe we can just get to know each other and start meeting every once in a while.'

"The guy offers to come get her. He picks her up from school and they have sex twice. That second time once he picks her up, he talks to her again about making money and that he has some friends who will pay or people he knows who will pay to have sex with her.

"She then—sometime later she calls him up and says, 'I'm ready to make money.' He then picks her up that same day and gets her a cell phone. He gives her the idea that they can make enough money to get an apartment together at some point. He starts prostituting her the next day. Other than the dates, he does not work in order to make money.

"This 15-year-old girl commits numerous commercial sex acts for money in Santa Clara County, Alameda County, San Francisco County, and Fresno County. During this time she's assaulted—physically assaulted four times. There are a lot of rules in this dynamic. The 15 year old can show no attitude. Can't say no, can't have sex with black man, can't look black men in the eye—can't look at black guys, dates can use the towel in the motel, dates can't kiss her on the mouth.

"She has to text this individual, this guy, 32 year old whenever a date arrives and tell him the length of time. She must put money in a specific locations among others [*sic*].

"There are consequences if she breaks any rules like being assaulted, must give him oral sex yelled at [*sic*]. This guy tells her to call him 'Daddy.' In the 15 year old's cell phone the 32 year old's number is programmed in and it's under the letter D. That 32 year old collects and keeps all the money after she—the 15 year old has the sex with Johns. She averages about seven to ten per day. The 32 year old determines all prices and time for the sex acts.
(continued)

32

asked Investigator Nichols whether he believed that a hypothetical 32-year-old man who committed certain acts against a hypothetical 15-year-old victim would be considered a pimp.

Defense counsel objected, arguing that the question called for an improper opinion, which the trial court overruled. Investigator Nichols subsequently testified that in his opinion, the hypothetical man "is a pimp but also more than that." Investigator Nichols further testified: "Because of the age of the minor under the age of 18 being induced into prostitution, which has now become sexual exploitation for commercial profit for money, that constitutes human trafficking."

### 2. *General Legal Principles and Standard of Review*

" 'California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id*., § 801). Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*Id*., subd. (a).)' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1044 (*Vang*).)

" 'When expert opinion is offered, much must be left to the trial court's discretion.' [Citation.] The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

---

"The period of time she's with him is February 4th, 2015 to February 23rd, 2015. And this 32 year old has three prior felonies for pimping and pandering. And in regard to each of these priors, the individual was physically violent with the prostitutes.

"Given all these factors about this individual, this 32 year old, do you have an opinion about whether he's a pimp?"

3. *Analysis*

Simmons argues that Investigator Nichols's response to the prosecutor's detailed hypothetical question was improper because it amounted to an assertion that he was guilty of human trafficking.

" 'Generally, an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth." ' " (*Vang*, *supra*, 52 Cal.4th at p. 1045.) In *Vang*, the California Supreme Court held that use of hypothetical questions "is subject to an important requirement," that the " 'hypothetical question must be rooted in facts shown by the evidence . . . .' " (*Ibid*.) Thus, a "prosecutor's hypothetical questions had to be based on what the evidence showed [Simmons] did, not what someone else might have done." (*Id*. at p. 1046.)

Here, Investigator Nichols never opined that Simmons was guilty of human trafficking. His response to the prosecutor's question was that the person in the hypothetical question had committed human trafficking. This expert opinion was proper. (See *Vang*, *supra*, 52 Cal.4th at pp. 1045-1046.)

Simmons argues that *Vang* noted that "there are dangers with hypothetical questions." (*Vang*, *supra*, 52 Cal.4th at p. 1051.) He insists that the hypothetical question mirrored the facts of the case so closely that the "dangers" observed by *Vang* were apparent, rendering Investigator Nichols's opinion inappropriate. The "dangers" noted by *Vang* included criticisms that hypothetical questions "might be unduly partisan or posed in an argumentative or obfuscating manner, might be overlong, might misrepresent or omit important facts, might confuse the jury, and might improperly be used as a 'closing argument midstream.' " (*Ibid*.) *Vang* expressly rejected the argument Simmons makes here that a hypothetical question should not adhere closely to the facts of a case, noting that "it is not a legitimate objection that the questioner failed to disguise the fact the question was based on the evidence." (*Ibid*.) Accordingly, the trial court did

not err when it permitted Investigator Nichols to answer the prosecutor's hypothetical question.

Simmons also claims that Investigator Nichols's opinion was tantamount to a directed verdict that deprived him of his right to a jury trial and to due process. However, "expert testimony is permitted even if it embraces the ultimate issue to be decided. (Evid. Code, § 805.)" (*Vang*, *supra*, 52 Cal.4th at p. 1049.) "The jury still plays a critical role in two respects. First, it must decide whether to credit the expert's opinion at all. Second, it must determine whether the facts stated in the hypothetical questions are the actual facts, and the significance of any difference between the actual facts and the facts stated in the questions." (*Id*. at pp. 1049-1050.) Here, the jury was instructed that it was not required to accept the expert's opinion as true. The jury was also instructed that an expert may have been asked a hypothetical question, and that it is the jury's role to decide whether the assumed facts in the hypothetical are true. In sum, Simmons's attempt to analogize his case to a directed verdict is without merit.[15]

D. *Cumulative Error*

Simmons contends that the cumulative effect of the trial court errors in his case deprived him of a fair trial. "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) We have found no errors. Because there are no errors to cumulate, Simmons's claim of cumulative error must be rejected.

E. *Mental Health Diversion*

Simmons argues that his convictions should be conditionally reversed so that the trial court can conduct a pretrial mental health diversion eligibility hearing under section 1001.36. Simmons argues that section 1001.36 as originally enacted by the

---

[15] Because we conclude that Investigator Nichols's opinion was properly admitted, we do not need to reach Simmons's argument that any error in admitting the testimony was reversible per se.

Legislature applies to his case and that under section 3, we must presume that the 2019 amendments to section 1001.36 apply prospectively and do not render him ineligible for diversion. He further claims that applying the 2019 amendments to section 1001.36 and to his case would result in an ex post facto violation. Simmons's argument raises questions of law that we review de novo. (See *People v. Whaley* (2008) 160 Cal.App.4th 779, 792.) As we explain, we disagree and conclude that the 2019 amendments to section 1001.36, which render Simmons ineligible for pretrial mental health diversion, apply retroactively; thus, Simmons is not entitled to a remand.

1. ***Legislative History of Section 1001.36***

Effective June 27, 2018, after Simmons was sentenced in this case, the Legislature enacted sections 1001.35 and 1001.36, which created a pretrial diversion program for certain defendants with mental health disorders. (Stats. 2018, ch. 34, § 24.) Section 1001.36 provides that a trial court may grant pretrial mental health diversion if it finds that the defendant is eligible because, among other factors, the defendant suffers from a qualifying mental disorder, the disorder played a significant role in the commission of the charged offense, and the defendant's symptoms will respond to mental health treatment. (§ 1001.36, subd. (b)(1)(A)-(F); *People v. Frahs* (2020) 9 Cal.5th 618, 626-627 (*Frahs*).) The maximum period of diversion is two years, and if the defendant performs satisfactorily in diversion, the trial court must dismiss the criminal charges that were the subject of the criminal proceedings at the time of the initial diversion. (§ 1001.36, subds. (c)(3), (e).)

On September 30, 2018, approximately three months after section 1001.36 was enacted and became effective, the Legislature amended section 1001.36. (Stats. 2018, ch. 1005, § 1.) In part, the amendments eliminated pretrial mental health diversion eligibility for defendants who are charged with certain offenses, including defendants who commit offenses of which a person, if convicted, would be required to register pursuant to section 290 (except for a violation of section 314). (§ 1001.36,

subd. (b)(2)(B).) This amendment to section 1001.36 took effect on January 1, 2019. (*People v. Cawkwell* (2019) 34 Cal.App.5th 1048, 1053-1054, review granted Aug. 14, 2019, S256113, review dismissed Aug. 26, 2020 (*Cawkwell*).) Simmons concedes that his convictions in this case require him to register as a sex offender under section 290, subdivision (c), and under the 2019 amendments, he is ineligible for pretrial mental health diversion.

### 2. *Section 3*, *the* **Estrada** *Rule*, *and the Rule of Lenity*

Simmons argues that section 1001.36 as originally enacted by the Legislature applies retroactively under the *Estrada* rule to his case. That version of section 1001.36, however, is no longer in effect because the Legislature has since amended the statute. Nonetheless, Simmons insists that the subsequent amendments to section 1001.36 cannot apply to him under section 3.

"Generally, statutes are presumed to apply only prospectively." (*Frahs*, *supra*, 9 Cal.5th at p. 627.) This presumption is codified by section 3, which states that "[n]o part of the [Penal Code] is retroactive, unless expressly so declared." "[T]he language of section 3 erects a strong presumption of prospective operation." (*People v. Brown* (2012) 54 Cal.4th 314, 324.) "However, this presumption is a canon of statutory interpretation rather than a constitutional mandate." (*Frahs*, *supra*, at p. 627.)

In *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), the California Supreme Court carved out an exception to section 3 and held that "an amendatory statute lessening punishment for a crime was presumptively retroactive and applied to all persons whose judgments were not yet final at the time the statute took effect." (*Frahs*, *supra*, 9 Cal.5th at p. 624; citing *Estrada*.) *Estrada* reasoned that " '[a] legislative mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law. Nothing is to be gained by imposing the more severe penalty after such a pronouncement; the excess in punishment can, by hypothesis, serve no purpose other than to satisfy a

desire for vengeance. As to a mitigation of penalties, then, it is safe to assume, as the modern rule does, that it was the legislative design that the lighter penalty should be imposed in all cases that subsequently reach the courts.' " (*Estrada*, *supra*, at pp. 745-746.)

*Frahs* concluded that *Estrada*'s inference of retroactivity applies to section 1001.36. (*Frahs*, *supra*, 9 Cal.5th at pp. 631-637.) Thus, we agree with Simmons that section 1001.36 is retroactive. The issue is which version of the statute applies to nonfinal cases.

Simmons does not cite to any authority, nor have we found any on our own, for the proposition that the *Estrada* rule permits the retroactive application of a statute that is no longer in effect. *Frahs* declined to address "the separate question of whether the 2019 amendments, which rendered defendants charged with certain crimes categorically ineligible for diversion, apply retroactively." (*Frahs*, *supra*, 9 Cal.5th at p. 640.) *Frahs* did not need to consider this question because the defendant in that case did not commit a crime that was categorically ineligible for diversion under the 2019 amendments. (See *id*. at pp. 625-626 [*Frahs* defendant was found guilty of two counts of second degree robbery and a lesser included misdemeanor offense of throwing a substance at a motor vehicle without intent to cause injury]; § 1001.36, subd. (b)(2) [listing categories of excluded criminal offenses].)

The resolution of Simmons's claim lies with the proper application of the *Estrada* rule. In *People v. Vieira* (2005) 35 Cal.4th 264 (*Vieira*), the California Supreme Court determined that when a statute is retroactive under *Estrada*, the statute that applies to nonfinal cases is the current version of the statute in effect at the time of the final judgment. (*Id*. at p. 305.) In *Vieira*, the defendant, who committed his crimes in 1990, argued on appeal that the trial court erred by imposing a restitution fine under former section 1202.4. (*Vieira*, *supra*, at pp. 274, 305.) The *Vieira* defendant argued that he was entitled to the benefit of a 1992 amendment to section 1202.4, which added language that

the imposition of a restitution fine was subject to a defendant's ability to pay. (*Vieira*, *supra*, at p. 305.) The California Supreme Court held that the defendant was not entitled to the benefit of the 1992 amendment because it was repealed in 1994, and restitution should be considered "under the current version" of section 1202.4 at the time of the final judgment. (*Vieira*, *supra*, at p. 305.) *Vieira* stated that " '[t]he key date is the date of final judgment. If the amendatory statute lessening punishment becomes effective prior to the date the judgment of conviction becomes final then, in our opinion, it, and not the old statute in effect when the prohibited act was committed, applies.' " (*Ibid*., quoting *Estrada*, *supra*, 63 Cal.2d at p. 744.) Applying the reasoning in *Vieira* to this case, the 2019 amended version of section 1001.36 is the version that applies to Simmons's case because that is the version that is in effect at the time of his final judgment. (See *Vieira*, *supra*, at p. 305; see also *Estrada*, *supra*, at p. 744.)

As we have stated, *Estrada* reasoned that current ameliorative statutes should be retroactive because " '[a] legislative mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law.' " (*Estrada*, *supra*, 63 Cal.2d at p. 745.) This rationale would be thwarted if we applied the original version of section 1001.36 because the Legislature has since made it clear that it does not believe that pretrial mental health diversion should apply to defendants who commit certain crimes, including crimes that require a defendant to register as a sex offender under section 290.

To support his argument that the 2019 amendments cannot apply to him, Simmons relies on several cases, including *People v. Perez* (1998) 68 Cal.App.4th 346 (*Perez*), abrogated on a different point as stated in *People v. Mazurette* (2001) 24 Cal.4th 789, 796. In *Perez*, the defendant committed his crime in 1996. (*Perez*, *supra*, at p. 349.) At the time the defendant committed his offense, the drug diversion statute (former § 1000) provided for pretrial diversion in certain drug cases without the requirement that the

defendant plead guilty to the charged offense. (*Perez*, *supra*, at p. 350.) By the time the *Perez* defendant was sentenced in 1997, section 1000 had been amended to provide for a deferred entry of judgment conditioned on a guilty plea. (*Perez*, *supra*, at p. 351.) Accordingly, the Court of Appeal held that "application of the 1997 amendments to section 1000 to pre-1997 conduct can be viewed as making a defendant's punishment more burdensome than the applicable punishment at the time of commission of the alleged conduct." (*Id*. at p. 356.) *Perez* observed that application of the 1997 version of section 1000 "arguably is a prohibited application of an ex post facto law." (*Perez*, *supra*, at p. 356.)

*Perez* is distinguishable. There, the defendant committed his offenses when the pretrial diversion program was already in effect. (*Perez*, *supra*, 68 Cal.App.4th at p. 350.) Here, Simmons committed his offenses in 2015, *before* section 1001.36 was enacted by the Legislature. Thus, the 2019 amendments to section 1001.36 could not have made Simmons's punishment "more burdensome than the applicable punishment at the time of the commission of the alleged conduct." (*Perez*, *supra*, at p. 356.)

Simmons also relies on *People v. Buycks* (2018) 5 Cal.5th 857, which reiterated that section 3 creates " 'a strong presumption of prospective operation, codifying the principle that, "in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the [lawmakers] . . . must have intended a retroactive application." ' " (*Buycks*, *supra*, at p. 880.) The general proposition reiterated in *Buycks*—that section 3's presumption of prospective application applies when the Legislature has not made an express retroactivity provision—is not applicable to this situation. There are no retroactivity provisions in either the original version of section 1001.36 or the 2019 amendments. The only way that section 1001.36 retroactively applies to Simmons is under the *Estrada* rule's exception to section 3 as "an amendatory statute lessening punishment for a crime." (*Frahs*, *supra*, 9 Cal.5th at p. 624; citing *Estrada*, *supra*, 63 Cal.2d 740.) And

40

here, under the current version of section 1001.36, Simmons is not entitled to pretrial mental health diversion.[16]

Finally, Simmons argues that imposing a retrospective intent on the 2019 amendments to section 1001.36 would violate the rule of lenity. (See *Perez*, *supra*, 68 Cal.App.4th at p. 357.) Under the rule of lenity, "courts resolve doubts as to the meaning of a statute in a criminal defendant's favor." (*People v. Cornett* (2012) 53 Cal.4th 1261, 1271.) " '[T]he rule of lenity is a tie-breaking principle, of relevance when " 'two reasonable interpretations of the same provision stand in relative equipoise . . . .' " ' " (*People v. Manzo* (2012) 53 Cal.4th 880, 889 (*Manzo*).) For example, the Court of Appeal in *Perez* held that to the extent there was uncertainty over whether the Legislature intended the 1997 version of section 1000 to apply retrospectively to pre-1997 conduct, "the more favorable construction of that section to defendants would be to apply it only to conduct committed on or after January 1, 1997." (*Perez*, *supra*, at p. 357.)

*Perez*, however, did not apply the rule of lenity to resolve uncertainty over the retroactive application of a statute that has since been amended and is no longer in effect. Moreover, we do not believe that applying the rule of lenity in this context is appropriate. The original and amended versions of section 1001.36 are silent about retroactivity, and the current version of section 1001.36 is retroactive to defendants whose judgments are not yet final under the *Estrada* rule. (*Frahs*, *supra*, 9 Cal.5th at pp. 631-637; see also *Vieira*, *supra*, 35 Cal.4th at p. 305.) There is no competing interpretation of the Legislature's intent that " ' " 'stand[s] in relative equipoise' " ' " to the *Estrada* rule's judicially created exception to section 3's presumption of prospective application.

---

[16] We express no opinion about whether section 3 requires a prospective application of the 2019 amendments to those defendants who committed their offenses during the brief period of time after section 1001.36 was originally enacted and before the 2019 amendments took effect, as that issue is not before us.

(*Manzo*, *supra*, 53 Cal.4th at p. 889.) Therefore, there is no ambiguity for us to resolve through the application of the rule of lenity.

### 3. *Ex Post Facto Violation and Due Process*

Simmons argues that if we conclude that the current version of section 1001.36 applies to his case, its application violates the state and federal ex post facto clauses.

Two appellate decisions have concluded that the retroactive application of the 2019 amendments to section 1001.36 does not violate the state and federal ex post facto clauses. (*People v. McShane* (2019) 36 Cal.App.5th 245, 259, review granted Sept. 18, 2019, S257018, review dismissed Aug. 26, 2020 [finding no ex post facto violation] (*McShane*); *Cawkwell*, *supra*, 34 Cal.App.5th at pp. 1053-1054 [same].)

In *McShane*, the Court of Appeal stated that " '[t]he purpose of the ex post facto doctrine is to ensure fair notice of the conduct that constitutes a crime and of the punishment that may be imposed for a crime. [Citation.]' [Citation.] Hence, ' "the operative event for retroactivity purposes, and the necessary reference point for any ex post facto analysis, is *criminal conduct* committed before the disputed law took effect." ' " (*McShane*, *supra*, 36 Cal.App.5th at p. 260.) *McShane* concluded that applying the amended version of section 1001.36 to the defendant was not an ex post facto violation because when the defendant committed his crime, he was not eligible for pretrial diversion because section 1001.36 did not yet exist. (*McShane*, *supra*, at p. 260.) Thus, *McShane* held that "the enactment of the murder exclusion [in section 1001.36] did not change the consequences of his crime *as of the time he committed it*. The fact . . . that he was briefly eligible for pretrial diversion under Penal Code section 1001.36, as originally enacted, is irrelevant to the retroactivity analysis." (*Ibid*.; see *Cawkwell*, *supra*, 34 Cal.App.5th at p. 1054 ["Cawkwell could not have relied on the possibility of receiving pretrial mental health diversion when he" committed the charged offenses].)

We agree with *McShane* and *Cawkwell* that applying the amendments to section 1001.36 to Simmons is not an ex post facto violation. Simmons was sentenced before

42

section 1001.36 was enacted.  The enactment of section 1001.36 and the subsequent enactment of the 2019 amendments that narrowed the class of defendants eligible for pretrial mental health diversion did not increase or decrease Simmons's potential punishment at the time he committed his crimes.  In other words, the 2019 amendments to section 1001.36 did not remove an ameliorative benefit as to Simmons.  Nor did the 2019 amendments increase Simmons's punishment.  (See *McShane*, *supra*, 36 Cal.App.5th at p. 260.)  Accordingly, there is no ex post facto violation.

For these same reasons, we conclude that Simmons's assertion that applying the 2019 amendments to section 1001.36 deprives him of due process of law is without merit. Simmons's argument is premised on his claim that he had a "vested right to a diversion hearing."  Simmons relies on *Strauss v. Horton* (2009) 46 Cal.4th 364, which held that the retroactive application of Proposition 8 to invalidate previously lawful same-sex marriages would conflict with principles of due process by depriving a person " 'of a vested right without due process of law.' " (*Id*. at p. 473.)  Simmons, however, had no vested right in pretrial mental health diversion.  When he committed his offenses in 2015, section 1001.36 did not exist, and he could not have relied upon its provisions.  And as we have determined, to the extent that section 1001.36 is retroactive under the *Estrada* rule, it is the current version—not the one that was briefly in effect while Simmons's appeal was pending—that is retroactive.  (See *Vieira*, *supra*, 35 Cal.4th at p. 305.)

In sum, Simmons is not entitled to remand for consideration for pretrial mental health diversion because he is ineligible under section 1001.36.

F. ***Retroactivity of Recent Amendments to Sections 1170 and 654***

After briefing in this case was completed, Simmons filed a supplemental brief arguing that recent legislative enactments that became effective January 1, 2022, Senate Bill No. 567 and Assembly Bill Nos. 124 and 518, retroactively apply to his case under the *Estrada* rule, and his case must be remanded for resentencing.  The Attorney General agrees that remand for resentencing is necessary.

43

1.  *Background*

In this case, the trial court sentenced Simmons to 15 years to life for his conviction of human trafficking of a minor by force or fear (§ 236.1, subd. (c); count 1), consecutive to a determinate term of 28 years for his remaining convictions.  As noted *ante*, footnote 8, the determinate term of 28 years included upper term sentences for counts 4, 5, 8, 10, 11, 12, and 14.  The trial court also imposed and stayed upper sentences of eight years for pimping a minor under the age of 16 (§ 266h, subd. (b)(2); count 2) and eight years for providing or transporting a child for a lewd act (§ 266j; count 3) under section 654.

When imposing the upper term for count 4, the trial court found in part that the aggravating circumstances outweighed the mitigating circumstances, and expressly considered factors such as Simmons's "status on probation and Post Release Community Supervision at the time of the alleged offense, his criminal history regarding similar conduct, that the Court believes to be callousness and cruelty [*sic*] with respect to the offenses in this case . . . and the totality of the circumstances and the vulnerability of the victim . . . ."  The trial court did not specifically articulate a reason for selecting the upper term for counts 5, 8, 10, and 14.  As to counts 11 and 12, the trial court stated that it was imposing "aggravated terms and consecutive terms" based on "the defendant's status on Post Release Community Supervision and probation.  The crimes and objectives being independent and separate of other counts committed at separate times, based on separate transactions and occurrences, the defendant's poor performance while on previous supervision and the defendant's record of engaging in criminal conduct of a similar nature in the past."

2.  *The* Estrada *Rule*

As discussed *ante*, part E.2., in *Estrada*, the California Supreme Court held that "an amendatory statute lessening punishment for a crime was presumptively retroactive and applied to all persons whose judgments were not yet final at the time the statute took effect."  (*Frahs*, *supra*, 9 Cal.5th at p. 624; citing *Estrada*, *supra*, 63 Cal.2d 740.)

44

"*Estrada* . . . stand[s] for the proposition that (i) in the absence of a contrary indication of legislative intent, (ii) legislation that ameliorates punishment (iii) applies to all cases that are not yet final as of the legislation's effective date."  (*People v. Esquivel* (2021) 11 Cal.5th 671, 675.)

### 3. *Retroactivity of Amendments to Procedure to Impose Upper Terms*

At the time Simmons was sentenced, former section 1170 provided that when a judgment of imprisonment is to be imposed and a statute specifies three possible terms, "the choice of the appropriate term rests within the sound discretion of the court." (Former § 1170, subd. (b).)  To inform the sentencing court's decision, California Rules of Court, rules 4.421 and 4.423 list various circumstances in aggravation (rule 4.421) and mitigation (rule 4.423).

Senate Bill No. 567 amended section 1170, effective January 1, 2022.  (Stats. 2021, ch. 731, § 1.3.)  Under the newly-amended version of section 1170, when a judgment of imprisonment is to be imposed and a statute specifies three possible terms, "the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in [section 1170, subdivision (b)(2)]." (§ 1170, subd. (b)(1).)  Section 1170, subdivision (b)(2) provides that the trial court may impose a sentence exceeding the middle term "only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."  Under section 1170, subdivision (b)(3), a trial court can consider a defendant's prior convictions when making its sentencing decision based on a certified record of conviction without submitting the prior conviction to a jury.

Here, nothing in the statutory language or legislative history of Senate Bill No. 567 indicates that the amendments to section 1170 were intended to apply prospectively.  Moreover, Senate Bill No. 567 is an ameliorative statute because it

45

provides for a presumptive middle term absent the presence of circumstances in aggravation that either must be stipulated to by the defendant or proven beyond a reasonable doubt to a jury or at a court trial. (§ 1170, subd. (b)(2).) Enacting restrictions on the trial court's discretionary ability to impose an upper term under section 1170 constitutes an ameliorative change in the law by reducing the possible punishment for certain defendants. (See *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 303 [*Estrada* inference of retroactivity applies to Proposition 57 because it "reduces the possible punishment for a class of persons"].) Finally, Simmons's judgment is not yet final, as it is pending on appeal. (*Vieira*, *supra*, 35 Cal.4th at p. 306.) Thus, we agree with the parties that under *Estrada*, Senate Bill No. 567's amendments to section 1170, subdivision (b) apply to Simmons's case.

Here, the trial court relied on multiple aggravating circumstances when imposing the upper terms in this case, including Simmons's "criminal history regarding similar conduct." Certainly, some of Simmons's criminal history was supported by the certified records of conviction that were admitted at trial, and a sentencing court can rely on certified records of conviction without having to submit the prior convictions to the jury. (§ 1170, subd. (b)(3).) However, the trial court also expressly relied on aggravating circumstances that were not stipulated to by Simmons or found true by the jury as required under section 1170, subdivision (b)(2), such as his "callousness and cruelty" and the "vulnerability of the victim." Moreover, we cannot discern from this record whether the trial court would have found a departure from the middle term to be justified based solely on prior convictions that were established by certified records. Thus, we agree with the parties that reversal is required.[17]

---

[17] We note that in *People v. Black* (2007) 41 Cal.4th 799, the California Supreme Court held that "the presence of one aggravating circumstance renders it lawful for the trial court to impose an upper term sentence" under a prior version of section 1170. (continued)

On remand, the Attorney General argues that the district attorney should be given the opportunity either to prove the existence of aggravating circumstances before a jury in compliance with section 1170, subdivision (b)(2) or to submit to resentencing based on the state of the current record. The Attorney General claims that such an election is proper because the district attorney was under no obligation to comply with the requirements of the amended version of section 1170, subdivision (b)(2) at the time of Simmons's trial or at sentencing, and such an election would not violate either the double jeopardy clause or constitute an ex post facto violation.

We agree with the Attorney General. Even if we assume that the double jeopardy clause applies to sentencing factors, Simmons has never been tried on any of the aggravating circumstances, rendering this constitutional provision inapplicable. (See *People v. Monge* (1997) 16 Cal.4th 826, 832 [double jeopardy clause " 'protects against a second prosecution or the same offense after acquittal' "].) Moreover, section 1170, subdivision (b)(2) does not increase the punishment for an offense because the same statutorily-prescribed sentencing range remains intact. (See *Collins v. Youngblood* (1990) 497 U.S. 37, 46 [ex post facto law is one that imposes an additional punishment to

---

(*Black*, *supra*, at p. 815.) The prior version of section 1170 considered in *Black* stated that " 'the [trial] court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime.' " (*Black*, *supra*, at p. 808.) Thus, the prior version of section 1170 permitted the trial court to rely on aggravating facts that were not found true by the jury. (*Black*, *supra*, at p. 808.) Under the Sixth Amendment of the federal Constitution, "any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence." (*Cunningham v. California* (2007) 549 U.S. 270, 281; *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490.) *Black* concluded that so long as one aggravating circumstance was found by a jury consistent with Sixth Amendment principles, judicial fact finding on additional aggravating circumstances was not unconstitutional. (*Black*, *supra*, at p. 815.) *Black* does not inform our decision because it is distinguishable. Unlike the prior version of section 1170 at issue in *Black*, the amended version of section 1170 that applies to Simmons's case *requires* that the aggravating circumstances relied on by the trial court be found true by a jury or stipulated to by a defendant. (§ 1170, subd. (b)(2).)

47

what was originally prescribed].)  Thus, on remand, the district attorney should be given the opportunity to prove the existence of aggravating circumstances in compliance with the amended statute.

      4. ***Retroactivity of Other Legislative Amendments***

In addition to Senate Bill No. 567's amendments changing the procedure to impose an upper term under section 1170, Simmons argues that he is entitled to retroactive application of amendments to section 1170 that were proposed by Assembly Bill No. 124.  Senate Bill No. 567, which was enacted after Assembly Bill No. 124, incorporated the amendments to section 1170 that were proposed by Assembly Bill No. 124.  Because it was enacted last, Senate Bill No. 567 takes precedence over Assembly Bill No. 124.  (*In re Thierry S.* (1977) 19 Cal.3d 727, 738 ["the bill signed last is the one which takes precedence"].)

As initially proposed in Assembly Bill No. 124, Senate Bill No. 567 added subdivision (b)(6) to section 1170, which now provides the following:  "Notwithstanding [section 1170, subdivision (b)(1)], and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. [¶] (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense. [¶] (C) Prior to the instant offense, or at the time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking."  (Stats. 2021, ch. 731, § 1.3.)

Simmons also argues that he is entitled to retroactive application of the amendments to section 654 made by Assembly Bill No. 518.  At the time Simmons was sentenced, former section 654, subdivision (a) provided in pertinent part that "[a]n act or

omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Effective January 1, 2022, Assembly Bill No. 518 amended section 654, subdivision (a), removing the requirement that an act or omission that is punishable by multiple statutes be punished under the statute providing for the longest term of imprisonment. (Stats. 2021, ch. 441, § 1.) Section 654, subdivision (a) now reads in pertinent part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."

We need not decide whether section 1170, subdivision (b)(6) or the amended version of section 654 retroactively applies to Simmons's case. Because we are remanding the matter for resentencing, the trial court on remand may reconsider all of its prior sentencing decisions as to all counts under the statutes that are now in effect, which includes both section 1170, subdivision (b)(6) and the amended version of section 654. (See *People v. Buycks*, *supra*, 5 Cal.5th at p. 893 ["when part of a sentence is stricken on review, on remand for resentencing, 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].)

## G. *Fines and Fees*

Finally, we address Simmons's claims regarding fines and fees. Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, Simmons argues that the trial court erroneously imposed fines and fees without considering his ability to pay them. We do not need to resolve this issue because we are already remanding the matter to the trial court. Should he choose to do so, Simmons can raise an argument regarding his ability to pay his fines and fees on remand.

49

### III. DISPOSITION

The sentences are vacated as to counts 2, 3, 4, 5, 8, 10, 11, 12, and 14, and the judgment is reversed and remanded for the sole purpose of resentencing. On remand, the trial court may reconsider all of its sentencing decisions, and the district attorney may elect to prove the circumstances in aggravation to permit the imposition of upper terms as required under Penal Code section 1170, subdivision (b)(2) or to submit to resentencing on the current record.

_____
                    Wilson, J.


WE CONCUR:




_____
          Elia, Acting P.J.




_____
          Grover, J.




People v. Simmons
H046379